**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

GENERAL MOTORS LLC,

               Plaintiff,

v.

THE PARTNERSHIPS and
UNINCORPORATED ASSOCIATIONS
IDENTIFIED ON SCHEDULE "A,"

               Defendants.

Case No. 23-cv-00916

## COMPLAINT

Plaintiff General Motors LLC (hereinafter, "GM" or "Plaintiff") hereby brings the present action against the Partnerships and Unincorporated Associations identified on Schedule A attached hereto (collectively, the "Defendants") and alleges as follows:

### I. JURISDICTION AND VENUE

1.    This Court has original subject matter jurisdiction over the claims in this action pursuant to the provisions of the Lanham Act, 15 U.S.C. § 1051, *et seq.*, 28 U.S.C. § 1338(a)-(b), and 28 U.S.C. § 1331.

2.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391, and this Court may properly exercise personal jurisdiction over Defendants since each of the Defendants directly targets business activities toward consumers in the United States, including Illinois, through at least the fully interactive e-commerce stores operating under the seller aliases identified in Schedule A attached hereto (the "Seller Aliases"). Specifically, Defendants have targeted sales to Illinois residents by setting up and operating e-commerce stores that target United States consumers using one or more Seller Aliases, offer shipping to the United States, including Illinois,

accept payment in U.S. dollars and/or funds from U.S. bank accounts, and, on information and belief, have sold products using infringing and counterfeit versions of GM's federally registered trademarks to residents of Illinois. Each of the Defendants is committing tortious acts in Illinois, is engaging in interstate commerce, and has wrongfully caused GM substantial injury in the State of Illinois.

## II. INTRODUCTION

3.      This action has been filed by GM to combat e-commerce store operators who trade upon GM's reputation and goodwill by offering for sale and/or selling unauthorized and unlicensed products, including automotive accessories, key chains, apparel, and home decor products using infringing and counterfeit versions of GM's federally registered trademarks (the "Counterfeit Cadillac Products"). Defendants create e-commerce stores operating under one or more Seller Aliases that are advertising, offering for sale, and selling Counterfeit Cadillac Products to unknowing consumers. E-commerce stores operating under the Seller Aliases share unique identifiers establishing a logical relationship between them and that Defendants' counterfeiting operation arises out of the same transaction, occurrence, or series of transactions or occurrences. Defendants attempt to avoid and mitigate liability by operating under one or more Seller Aliases to conceal both their identities and the full scope and interworking of their counterfeiting operation. GM is forced to file this action to combat Defendants' counterfeiting of its registered trademarks, as well as to protect unknowing consumers from purchasing Counterfeit Cadillac Products over the Internet. GM has been and continues to be irreparably damaged through consumer confusion, dilution, and tarnishment of its valuable trademarks as a result of Defendants' actions and seeks injunctive and monetary relief.

2

## III. THE PARTIES

**Plaintiff**

4.      Plaintiff General Motors LLC is a limited liability company of the State of Delaware, having its principal place of business at 300 Renaissance Center, Detroit, Michigan 48265-3000.

5.      GM, one of the most preeminent automotive brands in the world, was founded in 1908 as a separate and successor company to the already famous Durant-Dort Carriage Company, which had been the largest manufacturer of horse drawn vehicles prior to the explosion of automobiles. From its founding in 1908 to present day, GM has remained at the forefront of the automotive industry. For more than 75 years, GM has been one of the largest producers of automotive vehicles in the world, with more than 7 million vehicles sold to consumers yearly, resulting in more than 130 billion dollars in revenue.

6.      Cadillac was founded in 1902 by Henry M. Leland and named after French explorer Antoine Laumet de La Mothe, sieur de Cadillac who founded Detroit, Michigan in 1701. Cadillac is associated with some of the most famous and storied brands in the automotive industry, including Escalade, CTS, DeVille, and SRX. In 2020, over one-hundred (100) thousand automobiles were sold in the United States under the Cadillac brand.

7.      Propelled by its reputation and recognizable trademarks, which are carefully curated and monitored, consumers recognize GM and its Cadillac brand as a source of reliable and quality vehicles, vehicle parts and accessories, miniature vehicles and toys, and various other lifestyle products (collectively, the "Cadillac Products").

8.      GM has registered many of its trademarks with the United States Patent and Trademark Office. Cadillac Products typically include at least one of GM's registered trademarks.

GM uses its trademarks in connection with the marketing of its Cadillac Products, including the following marks which are collectively referred to as the "Cadillac Trademarks."

| Registration No. | Trademark | Class | Goods and Services |
|---|---|---|---|
| 1,900,372 | CADILLAC | 009 | Eyeglasses |
| 1,665,834 | CADILLAC | 016 | Pens |
| 1,711,662 | CADILLAC | 016 | Printed materials; namely, manuals, brochures, and catalogs pertaining to the features and controls, operation, maintenance, service and repair, and technical facts and specifications of motor vehicles |
| 1,663,465 | CADILLAC | 021 | Ceramic mugs |
| 1,782,739 | CADILLAC | 025 | Clothing; namely, hats, shirts, T-shirts, and sweatshirts |
| 1,681,292 | CADILLAC | 027 | Carpeting for automobiles |
| 1,700,662 | CADILLAC | 028 | Scale models of automobiles |
| 1,660,237 | CADILLAC | 042 | Automobile and truck dealership services |
| 2,931,761 | CADILLAC | 009 | Optical frames, eyewear lenses, eyewear cases |
| 2,654,530 | CADILLAC | 020 | Chairs, non-metal license plates, plastic flag, stools |
| 3,609,853 | CADILLAC | 034 | Cigar and cigarette lighters not for land vehicles |

| Registration No. | Trademark | Class | Goods and Services |
|---|---|---|---|
| 647,241 | CADILLAC | 037 | Maintenance and repair service for automotive vehicles, parts, and accessories |
| 4,309,670 | CADILLAC CUE | 009 | User interfaces for electronic devices sold as an integral part of automobiles |
| 2,568,017 | CADILLAC PALACE | 041 | Entertainment services; namely, rehearsing, producing and presenting live theatrical productions, ballet, dance and music recitals, live music concerts, motion pictures charitable and entertainment productions, vaudeville and variety shows, fashion and style shows, meetings and other public presentations |
| 6,131,047 | CT4 | 012 | Motor land vehicles, namely, automobiles, sport utility vehicles, trucks, vans, engines therefor and structural parts thereof |

| Registration No. | Trademark | Class | Goods and Services |
|---|---|---|---|
| 6,119,389 | CT5 | 012 | Motor land vehicles, namely, automobiles, sport utility vehicles, trucks, vans, engines therefor and structural parts thereof |
| 5,013,439 | CT6 | 012 | Motor land vehicles, namely, automobiles, sport utility vehicles, trucks, vans, engines therefor and structural parts thereof |
| 2,605,909 | CTS | 012 | Motor land vehicles, namely, automobiles, engines therefor and structural parts thereof |
| 3,261,764 | CTS | 009 | Optical frames, eyewear lenses, eyewear cases |
| 2,931,762 | DEVILLE | 009 | Optical frames, eyewear lenses, eyewear cases |
| 2,931,763 | ESCALADE | 009 | Optical frames, eyewear lenses, eyewear cases |
| 2,269,827 | ESCALADE | 012 | Motor land vehicles, namely, automobiles, sport utility vehicles, trucks, engines therefor and |

| Registration No. | Trademark | Class | Goods and Services |
|---|---|---|---|
| | | | structural parts thereof |
| 3,520,169 | ESCALADE | 025 | Clothing, namely t-shirts |
| 3,520,185 | ESCALADE | 025 | Clothing, namely, jackets |
| 2,792,883 | ESV | 012 | Motor land vehicles, namely, automobiles, sport utility vehicles, trucks, vans, engines therefor and structural parts thereof |
| 2,830,721 | SRX | 012 | Motor land vehicles, namely, automobiles, sport utility vehicles, trucks, vans, engines therefor and structural part thereof |
| 2,631,773 | STS | 012 | Motor land vehicles, namely, automobiles, sport utility vehicles, trucks, vans, structural parts thereof, and engines therefor |
| 5,018,505 | XT5 | 012 | Motor land vehicles, namely, automobiles, sport utility vehicles, trucks, vans, engines therefor and |

| Registration No. | Trademark | Class | Goods and Services |
|---|---|---|---|
|  |  |  | structural parts thereof |
| 5,864,138 | XT4 | 012 | Motor land vehicles, namely, automobiles, sport utility vehicles, trucks, vans, and engines therefor ; motor land vehicles, namely, automobiles, sport utility vehicles, trucks, vans and structural parts thereof |
| 6,097,037 | XT6 | 012 | Motor land vehicles, namely, automobiles, sport utility vehicles, trucks, vans, and engines therefor; motor land vehicles, namely, automobiles, sport utility vehicles, trucks, vans and structural parts thereof |
| 1,570,808 | *Cadillac* | 012 | Motor vehicles; namely, automobiles, engines therefor, and structural parts thereof |
| 201,694 | *Cadillac* | 012 | Automobiles |

| Registration No. | Trademark | Class | Goods and Services |
|---|---|---|---|
| 1,736,492 |  | 016 | Printed materials; namely, manuals, brochures, and catalogs pertaining to the features and controls, operation, maintenance, service and repair, and technical facts and specifications of motor vehicles |
| 1,768,653 |  | 018 | Key fobs, key cases |
| 1,723,245 |  | 006 | Keys made of metal for locks |
| 1,686,536 |  | 026 | Belt buckles not of precious metal for clothing |
| 1,871,376 |  | 025 | Clothing; namely, sweatshirts, knit shirts, sweaters hats T-shirts |
| 1,872,415 |  | 014 | Key fobs made of silver; watches, clocks, watchbands, cuff links, tie tack pins, stick pins, and money clips made of brushed gold |

| Registration No. | Trademark | Class | Goods and Services |
|---|---|---|---|
| 2,659,597 |  | 020 | Non-metal license plates, plastic flags |
| 2,609,932 |  | 025 | Clothing, namely, aprons, caps, coat, dress shirts, gloves, golf shirts, hats, jackets, neckties, polo shirts, rainwear, robes, scarves, shoes, sleep wear, slippers, sunvisors, sweat pants, sweat shirts, sweaters, t-shirts |
| 2,654,531 |  | 020 | Non-metal license plates, plastic flags |
| 2,750,240 |  | 018 | Back packs, billfolds, briefcases, business card cases, carry-on bags, duffel bags, garment bags, luggage, overnight bags, tote bags, umbrellas, wallets |
| 2,779,457 |  | 006 | Metal key chains, metal key fobs, metal key rings, metal keys, license plates made of metal, non-luminous and non-mechanical |

| Registration No. | Trademark | Class | Goods and Services |
|---|---|---|---|
| | | | metal signs, ornamental replicas of vehicles made of metal, non-luminous and non-mechanical parking signs made of metal, non-luminous and non-mechanical street signs made of metal |
| 3,159,729 |  | 009 | Optical frames, eyewear lenses |
| 3,900,704 |  | 037 | Automotive maintenance and repair |
| 3,900,705 |  | 035 | Automobile dealerships |
| 4,622,276 |  | 035 | Automobile dealerships |
| 4,622,277 |  | 037 | Maintenance and repair services for motor vehicles |

| Registration No. | Trademark | Class | Goods and Services |
|---|---|---|---|
| 4,642,212 |  | 012 | Motor land vehicles and structural parts therefor, namely, automobiles, sport utility vehicles, trucks, vans, and engines therefor |
| 4,728,403 |  | 024 | Golf towels, blanket throws, cloth flags |
| 4,827,580 |  | 016 | Pens, pencils, notepads, notebooks, books in the field of automobiles, posters, calendars, decals; Printed materials, namely, manuals, brochures, and catalogs pertaining to the features and controls, operation, maintenance, service and repair, and technical facts and specifications of motor vehicles; Money clips made of metal, non-metal money clips |
| 4,827,581 |  | 018 | Backpacks, billfolds, briefcases, business card cases, carry-on bags, messenger bags, |

| Registration No. | Trademark | Class | Goods and Services |
|---|---|---|---|
| | | | duffel bags, garment bags for travel, luggage, overnight bags, tote bags, umbrellas, wallets |
| 4,827,582 | | 025 | Clothing, namely, caps, coats, dress shirts, golf shirts, hats, jackets, polo shirts, sweat shirts, sweaters, t-shirts |
| 4,837,265 | | 021 | Drinking glasses, mugs, travel insulated beverage containers, flasks, portable coolers |
| 2,875,574 | | 012 | Motor land vehicles, namely, automobiles, sport utility vehicles, trucks, vans, engines therefor and structural parts thereof |

9.     The above U.S. registrations for the Cadillac Trademarks are valid, subsisting, in full force and effect, and many are incontestable pursuant to 15 U.S.C. § 1065.  The registrations for the Cadillac Trademarks constitute *prima facie* evidence of their validity and of GM's exclusive right to use the Cadillac Trademarks pursuant to 15 U.S.C. § 1057(b).  True and correct copies of the United States Registration Certificates for the above-listed Cadillac Trademarks are attached hereto as **Exhibit 1**.

10.     The Cadillac Trademarks are distinctive when applied to the Cadillac Products, signifying to the purchaser that the products come from GM and are manufactured to GM's quality

13

standards. Whether GM manufactures the products itself or contracts with others to do so, GM has ensured that products bearing the Cadillac Trademarks are manufactured to the highest quality standards.

11.     The Cadillac Trademarks are famous marks, as that term is used in 15 U.S.C. § 1125(c)(1), and have been used by GM for many years. The innovative marketing and product designs of the Cadillac Products have enabled the Cadillac brand to achieve widespread recognition and fame and have made the Cadillac Trademarks some of the most well-known marks in the industry. The widespread fame, outstanding reputation, and significant goodwill associated with the Cadillac brand have made the Cadillac Trademarks valuable assets of GM.

12.     GM has expended substantial time, money, and other resources in developing, advertising and otherwise promoting the Cadillac Trademarks. In fact, GM has expended millions of dollars annually in advertising, promoting, and marketing featuring the Cadillac Trademarks. Cadillac Products have also been the subject of extensive unsolicited publicity resulting from their high quality, performance, and innovative design. As a result, products bearing the Cadillac Trademarks are widely recognized and exclusively associated by consumers, the public, and the trade as being high-quality products sourced from GM. Cadillac Products have become among the most popular of their kind in the U.S. and the world. The Cadillac Trademarks have achieved tremendous fame and recognition which has only added to the distinctiveness of the marks. As such, the goodwill associated with the Cadillac Trademarks is of incalculable and inestimable value to GM.

13.     Cadillac Products are sold online via the Cadillac.com website and through authorized dealers and licensees, including several in the Chicago area. Sales of Cadillac Products

14

via the Cadillac.com website are significant. The Cadillac.com website features proprietary content, images, and designs exclusive to the Cadillac brand.

**The Defendants**

14. Defendants are individuals and business entities of unknown makeup who own and/or operate one or more of the e-commerce stores under at least the Seller Aliases identified on Schedule A and/or other seller aliases not yet known to Plaintiff. On information and belief, Defendants reside and/or operate in the People's Republic of China or other foreign jurisdictions, or redistribute products from the same or similar sources in those locations. Defendants have the capacity to be sued pursuant to Federal Rule of Civil Procedure 17(b).

15. On information and belief, Defendants, either individually or jointly, operate one or more e-commerce stores under the Seller Aliases listed in Schedule A attached hereto. Tactics used by Defendants to conceal their identities and the full scope of their operations make it virtually impossible for Plaintiff to learn Defendants' true identities and the exact interworking of their counterfeit network. If Defendants provide additional credible information regarding their identities, Plaintiff will take appropriate steps to amend the Complaint.

## IV. DEFENDANTS' UNLAWFUL CONDUCT

16. The success of the Cadillac brand has resulted in significant counterfeiting of the Cadillac Trademarks. Consequently, GM has a worldwide anti-counterfeiting program and regularly investigates suspicious e-commerce stores identified in proactive Internet sweeps and reported by consumers. In recent years, GM has identified many fully interactive, e-commerce stores offering Counterfeit Cadillac Products on online marketplace platforms such as Amazon, eBay, AliExpress, Alibaba, Walmart, Etsy, Wish.com, and DHgate, including the e-commerce stores operating under the Seller Aliases. The Seller Aliases target consumers in this Judicial

District and throughout the United States.  According to U.S. Customs and Border Protection (CBP) report, in 2021, CBP made over 27,000 seizures of goods with intellectual property rights (IPR) violations totaling over $3.3 billion, an increase of $2.0 billion from 2020. *Intellectual Property Rights Seizure Statistics, Fiscal Year 2021*, U.S. Customs and Border Protection (**Exhibit 2**).  Of the 27,000 in total IPR seizures, over 24,000 came through international mail and express courier services (as opposed to containers), 51 percent of which originated from China and Hong Kong.  *Id*.

17.     Third party service providers like those used by Defendants do not adequately subject new sellers to verification and confirmation of their identities, allowing counterfeiters to "routinely use false or inaccurate names and addresses when registering with these e-commerce platforms."  **Exhibit 3**, Daniel C.K. Chow, *Alibaba, Amazon, and Counterfeiting in the Age of the Internet*, 40 NW. J. INT'L L. & BUS. 157, 186 (2020); *see also*, report on "Combating Trafficking in Counterfeit and Pirated Goods" prepared by the U.S. Department of Homeland Security's Office of Strategy, Policy, and Plans (Jan. 24, 2020) attached as **Exhibit 4** and finding that on "at least some e-commerce platforms, little identifying information is necessary for a counterfeiter to begin selling" and recommending that "[s]ignificantly enhanced vetting of third-party sellers" is necessary.  Counterfeiters hedge against the risk of being caught and having their websites taken down from an e-commerce platform by preemptively establishing multiple virtual store-fronts. **Exhibit 4** at 22.  Since platforms generally do not require a seller on a third-party marketplace to identify the underlying business entity, counterfeiters can have many different profiles that can appear unrelated even though they are commonly owned and operated.  **Exhibit 4** at 39.  Further, "E-commerce platforms create bureaucratic or technical hurdles in helping brand owners to locate or identify sources of counterfeits and counterfeiters."  **Exhibit 3** at 186-187.

18.     Defendants have targeted sales to Illinois residents by setting up and operating e-commerce stores that target United States consumers using one or more Seller Aliases, offer shipping to the United States, including Illinois, accept payment in U.S. dollars and/or funds from U.S. bank accounts and, on information and belief, have sold Counterfeit Cadillac Products to residents of Illinois.

19.     Defendants concurrently employ and benefit from substantially similar advertising and marketing strategies.  For example, Defendants facilitate sales of Counterfeit Cadillac Products by designing the e-commerce stores operating under the Seller Aliases so that they appear to unknowing consumers to be authorized online retailers, outlet stores, or wholesalers.  E-commerce stores operating under the Seller Aliases appear sophisticated and accept payment in U.S. dollars and/or funds from U.S. bank accounts via credit cards, Alipay, Amazon Pay, and/or PayPal.  E-commerce stores operating under the Seller Aliases often include content and images that make it very difficult for consumers to distinguish such stores from an authorized retailer.  On information and belief, Plaintiff has not licensed or authorized Defendants to use any of the Cadillac Trademarks, and none of the Defendants are authorized retailers of genuine Cadillac Products.

20.     Many Defendants also deceive unknowing consumers by using one or more Cadillac Trademarks without authorization within the content, text, and/or meta-tags of their e-commerce stores to attract various search engines crawling the Internet looking for websites relevant to consumer searches for Cadillac Products.  Other e-commerce stores operating under Seller Aliases omit using Cadillac Trademarks in the item title to evade enforcement efforts while using strategic item titles and descriptions that will trigger their listings when consumers are searching for Cadillac Products.

21.     E-commerce store operators like Defendants commonly engage in fraudulent conduct when registering the Seller Aliases by providing false, misleading and/or incomplete information to e-commerce platforms to prevent discovery of their true identities and the scope of their e-commerce operation.

22.     E-commerce store operators like Defendants regularly register or acquire new seller aliases for the purpose of offering for sale and selling Counterfeit Cadillac Products.  Such seller alias registration patterns are one of many common tactics used by e-commerce store operators like Defendants to conceal their identities, the full scope and interworking of their counterfeiting operation, and to avoid being shut down.

23.     Even though Defendants operate under multiple fictitious aliases, the e-commerce stores operating under the Seller Aliases often share unique identifiers, such as templates with common design elements that intentionally omit any contact information or other information for identifying Defendants or other Seller Aliases they operate or use.  E-commerce stores operating under the Seller Aliases include other notable common features such as use of the same registration patterns, accepted payment methods, check-out methods, keywords, advertising tactics, similarities in price and quantities, the same incorrect grammar and misspellings, and/or the use of the same text and images.  Additionally, Counterfeit Cadillac Products for sale by the Seller Aliases bear similar irregularities and indicia of being counterfeit to one another, suggesting that the Counterfeit Cadillac Products were manufactured by and come from a common source and that Defendants are interrelated.

24.     E-commerce store operators like Defendants are in constant communication with each other and regularly participate in QQ.com chat rooms and through websites such as

sellerdefense.cn, kaidianyo.com and kuajingvs.com regarding tactics for operating multiple accounts, evading detection, pending litigation, and potential new lawsuits.

25.     Counterfeiters such as Defendants typically operate under multiple seller aliases and payment accounts so that they can continue operation in spite of GM's enforcement. E-commerce store operators like Defendants maintain off-shore bank accounts and regularly move funds from their financial accounts to off-shore accounts outside the jurisdiction of this Court to avoid payment of any monetary judgment awarded to GM. Indeed, analysis of financial account transaction logs from previous similar cases indicates that off-shore counterfeiters regularly move funds from U.S.-based financial accounts to off-shore accounts outside the jurisdiction of this Court.

26.     Defendants are working in active concert to knowingly and willfully manufacture, import, distribute, offer for sale, and sell Counterfeit Cadillac Products in the same transaction, occurrence, or series of transactions or occurrences. Defendants, without any authorization or license from GM, have jointly and severally, knowingly and willfully used and continue to use the Cadillac Trademarks in connection with the advertisement, distribution, offering for sale, and sale of the Counterfeit Cadillac Products into the United States and Illinois over the Internet.

27.     Defendants' unauthorized use of the Cadillac Trademarks in connection with the advertising, distribution, offering for sale, and sale of Counterfeit Cadillac Products, including the sale of Counterfeit Cadillac Products into the United States, including Illinois, is likely to cause and has caused confusion, mistake, and deception by and among consumers and is irreparably harming GM.

## COUNT I
## TRADEMARK INFRINGEMENT AND COUNTERFEITING (15 U.S.C. § 1114)

28.     GM hereby re-alleges and incorporates by reference the allegations set forth in the preceding paragraphs.

29.     This is a trademark infringement action against Defendants based on their unauthorized use in commerce of counterfeit imitations of the federally registered Cadillac Trademarks in connection with the sale, offering for sale, distribution, and/or advertising of infringing goods.  The Cadillac Trademarks are highly distinctive marks.  Consumers have come to expect the highest quality from Cadillac Products sold or marketed under the Cadillac Trademarks.

30.     Defendants have sold, offered to sell, marketed, distributed, and advertised, and are still selling, offering to sell, marketing, distributing, and advertising products using counterfeit reproductions of the Cadillac Trademarks without GM's permission.

31.     GM is the exclusive owner of the Cadillac Trademarks. GM's United States Registrations for the Cadillac Trademarks (**Exhibit 1**) are in full force and effect. On information and belief, Defendants have knowledge of GM's rights in the Cadillac Trademarks and are willfully infringing and intentionally using counterfeits of the Cadillac Trademarks.  Defendants' willful, intentional, and unauthorized use of the Cadillac Trademarks is likely to cause and is causing confusion, mistake, and deception as to the origin and quality of the Counterfeit Cadillac Products among the general public.

32.     Defendants' activities constitute willful trademark infringement and counterfeiting under Section 32 of the Lanham Act, 15 U.S.C. § 1114.

33.     GM has no adequate remedy at law and, if Defendants' actions are not enjoined, GM will continue to suffer irreparable harm to its reputation and the goodwill of its well-known Cadillac Trademarks.

34.     The injuries and damages sustained by GM have been directly and proximately caused by Defendants' wrongful reproduction, use, advertisement, promotion, offering to sell, and sale of Counterfeit Cadillac Products.

**COUNT II**
**FALSE DESIGNATION OF ORIGIN (15 U.S.C. § 1125(a))**

35.     GM hereby re-alleges and incorporates by reference the allegations set forth in the preceding paragraphs.

36.     Defendants' promotion, marketing, offering for sale, and sale of Counterfeit Cadillac Products has created and is creating a likelihood of confusion, mistake, and deception among the general public as to the affiliation, connection, or association with GM or the origin, sponsorship, or approval of Defendants' Counterfeit Cadillac Products by GM.

37.     By using the Cadillac Trademarks in connection with the sale of Counterfeit Cadillac Products, Defendants create a false designation of origin and a misleading representation of fact as to the origin and sponsorship of the Counterfeit Cadillac Products.

38.     Defendants' false designation of origin and misrepresentation of fact as to the origin and/or sponsorship of the Counterfeit Cadillac Products to the general public involves the use of counterfeit marks and is a willful violation of Section 43 of the Lanham Act, 15 U.S.C. § 1125.

39.     GM has no adequate remedy at law and, if Defendants' actions are not enjoined, GM will continue to suffer irreparable harm to its reputation and the goodwill of its Cadillac Trademarks and brand.

## PRAYER FOR RELIEF

WHEREFORE, GM prays for judgment against Defendants as follows:

1) That Defendants, their affiliates, officers, agents, servants, employees, attorneys, confederates, and all persons acting for, with, by, through, under or in active concert with them be temporarily, preliminarily and permanently enjoined and restrained from:

   a. using the Cadillac Trademarks or any reproductions, counterfeit copies, or colorable imitations thereof in any manner in connection with the distribution, promotion, marketing, advertising, offering for sale, or sale of any product that is not a genuine Cadillac Product or is not authorized by GM to be sold in connection with the Cadillac Trademarks;

   b. passing off, inducing, or enabling others to sell or pass off any products as genuine Cadillac Products or any other products produced by GM that are not GM's, or not produced under the authorization, control, or supervision of GM and approved by GM for sale under the Cadillac Trademarks;

   c. committing any acts calculated to cause consumers to believe that Defendants' Counterfeit Cadillac Products are those sold under the authorization, control, or supervision of GM, or are sponsored by, approved by, or otherwise connected with GM;

   d. further infringing the Cadillac Trademarks and damaging GM's goodwill; and

   e. manufacturing, shipping, delivering, holding for sale, transferring or otherwise moving, storing, distributing, returning, or otherwise disposing of, in any manner, products or inventory not manufactured by or for GM, nor authorized by GM to be sold or offered

for sale, and which bear any of GM's trademarks, including the Cadillac Trademarks, or any reproductions, counterfeit copies, or colorable imitations thereof;

2) Entry of an Order that, upon GM's request, those with notice of the injunction, including, without limitation, any online marketplace platforms such as eBay, AliExpress, Alibaba, Amazon, Walmart, Etsy, Wish.com, and DHgate (collectively, the "Third Party Providers") shall disable and cease displaying any advertisements used by or associated with Defendants in connection with the sale of counterfeit and infringing goods using the Cadillac Trademarks;

3) That Defendants account for and pay to GM all profits realized by Defendants by reason of Defendants' unlawful acts herein alleged, and that the amount of damages for infringement of the Cadillac Trademarks be increased by a sum not exceeding three times the amount thereof as provided by 15 U.S.C. § 1117;

4) In the alternative, that GM be awarded statutory damages for willful trademark counterfeiting pursuant to 15 U.S.C. § 1117(c)(2) of $2,000,000 for each and every use of the Cadillac Trademarks;

5) That GM be awarded its reasonable attorneys' fees and costs; and

6) Award any and all other relief that this Court deems just and proper.

Dated this 14th day of February 2023.    Respectfully submitted,

/s/ Justin R. Gaudio
Amy C. Ziegler
Justin R. Gaudio
Jake M. Christensen
Rachel S. Miller
Greer, Burns & Crain, Ltd.
300 South Wacker Drive, Suite 2500
Chicago, Illinois 60606
312.360.0080
312.360.9315 (facsimile)
aziegler@gbc.law
jgaudio@gbc.law
jchristensen@gbc.law
rmiller@gbc.law

*Attorneys for Plaintiff General Motors LLC*